IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

AT HUNTINGTON

**TIMOTHY R. JONES and**
**JANIE COLE**
178 Elm Street
Winfield, WV 252134

       **Plaintiffs,**

v.                                        **CIVIL ACTION NO.: 3:19-cv-00618**

                                           **JUDGE: Robert C. Chambers**

**THE BOARD OF EDUCATION OF**
**PUTNAM COUNTY, WEST VIRGINIA,**
**JOHN HUDSON, individually and in his official capacity as**
**Superintendent of Schools for Putnam County,**
**SHARLA GRIFFITH, individually and in her capacity as**
**Putnam County Director of Exceptional Education,**
**CANDI HATFIELD, individually and in her official capacity as**
**Principal of Winfield Elementary School,**
**ALICIA COEY, a/k/a ALICIA POWELL, individually**
**and in her official capacity as a Prevention Resource Officer and**
**EDDIE STARCHER, individually and in his official capacity as**
**Chief of Police of Winfield, West Virginia**

       **Defendants.**

**PLAINTIFFS' FIRST AMENDED COMPLAINT**

      Pursuant to Rule 15(a)(1)(B), Federal Rules of Civil Procedure, Timothy R. Jones and Janie Cole make this First Amended Complaint and state as follows:

      1.     At all times relevant to this civil action Timothy R. Jones and Janie Cole were citizens and residents of the State of West Virginia, residing at 178 Elm Street, Winfield, Putnam County, West Virginia.

2. Timothy R. Jones and Janie Cole are man and wife and the custodial parents of Z.S.J., an infant child.

3. At all times relevant to this civil action Z.S. J. was a student at Winfield Elementary School, located at 2 Wall Street within the city of Winfield, Putnam County, West Virginia 25213.

4. At Winfield Elementary School Z.S.J. was a student with Downs Syndrome and a moderate to severe intellectual disability requiring speech language therapy and occupational therapy.

5. As a result of his Downs Syndrome and moderate to severe intellectual disability, Z.S.J is limited in his ability to ambulate, dress himself, see to his basic personal needs, communicate effectively, relate acceptably with others or carry out most major activities of daily living; consequently, Z.S.J is physically and intellectually disabled, as defined by all applicable laws of the United States and West Virginia, including Section 504 of the Rehabilitation Act of 1973, currently codified at 29 U.S.C §794, the Americans With Disabilities Act of 1991, 42 U.S.C. §§ 12101 *et seq*. and the West Virginia Human Rights Act, W. Va. Code §5-11-1, *et seq*.

6. The Board of the Education of Putnam County [the Board] is a local educational agency (as defined by 20 U.S.C. §7801), that operates the system of free public schools in Putnam County, West Virginia, from its central office located at 77 Courthouse Dr., Winfield, WV, 25213.

7. At all times relevant to this civil action John Hudson [Hudson] was employed in the central office of the Board as the Superintendent of Schools.

8. At all times relevant to this civil action Sharla Griffith [Griffith] was employed in the central office of the Board as Director of Exceptional Education.

9. At all times relevant to this civil action Candi Hatfield [Hatfield] was employed by the Board as the principal of Winfield Elementary School.

10. At all times relevant to this civil action Hudson, Griffith and Hatfield were subject to the Putnam County Board of Education policy manual that specifically provided that no staff member should engage in harassment, including disability harassment.

11. At all times relevant to this civil action Hudson, Griffith and Hatfield were subject to the Putnam County Board of Education policy manual that specifically provided that the Board welcomes and encourages visits to school by parents provided that such visitors report to the school office immediately upon entering the school or other Putnam County school facility.

12. At all times relevant to this civil action Alicia Coey, a/k/a Alicia Powell, [Coey] was an employee of the City of Winfield, purportedly acting as a Prevention Resource Officer or School Resource Officer on the premises of Winfield Elementary School, without required certification, without specific written contractual duties and responsibilities, without being a current full time, state certified police officer and while generally attired in blue jeans, a head band with pushed up reflective sunglasses, a dark tee shirt and flip flop sandals.

13. At all times relevant to this civil action Coey was present on the school grounds of Winfield Elementary School subject to a "School Resource Officer Memorandum Of Understanding; Winfield Police Department & Putnam County Board Of Education" which specifically provided that Coey acknowledge Hatfield as the administrative leader of the school and that Coey was subject to the directives and supervision of Hatfield at all times while on school grounds.

14. During at least part of the time relevant to this civil action, Coey was present on the school grounds of Winfield Elementary School subject to an "AGREEMENT" dated May 31, 2018, effective beginning July 1, 2018 through the 30th day of June 2019, which provided that Coey should not function as a school disciplinarian or safety officer.

15. At all times relevant to this civil action, Coey was present on the school grounds of Winfield Elementary School subject to the guidelines and procedures for prevention resource officers which required her, if actually functioning as a prevention resource officer, to maintain an office at the school, be present in the school at least 35 hours per week, to adhere to all school policies and the teachers code of conduct, to directly report to Hatfield, and to wear a uniform and gun while on duty on the campus of Winfield Elementary School.

16. At all times relevant to this civil action, Coey was present on the grounds of Winfield Elementary School subject to the guidelines and procedures for prevention resource officers which prohibited her from functioning as a school disciplinarian or safety officer or intervening in the normal disciplinary actions of the school or from performing any duties that fall within the realm of existing school personnel.

17. At all times relevant to this civil action, Coey was present on the grounds of Winfield Elementary School subject to a handwritten memorandum of understanding limiting her presence at the school to four hours of service each day in the school office.

18. At all times relevant to this civil action Eddie Starcher [Starcher] was an employee of the City of Winfield exercising some degree of authority and control over the conduct of Coey.

19. At no time relevant to this civil action were either Coey or Starcher qualified to interact with the plaintiffs regarding the individual education plans put in place for Z.S.J, to assess the reasonableness of requests for disability accommodations, or to perform any other meaningful function relative to the interaction of the plaintiffs and the Board regarding advocacy for an accommodation related to their son's disability.

20. At no time relevant to this civil action were either Starcher or Coey authorized to access confidential information relative to plaintiffs' son's disability nor to discuss implementation

4

of any aspect of their son's individual educational plans at Winfield Elementary School, including the nature of their son's disability limitations that required accommodation in drop off for attendance at school.

21. Winfield Elementary School is a place of public accommodations as defined by W. Va. Code §5-11-3(j).

22. The Board, Hudson, Griffith, Hatfield, Coey and Starcher at all times relevant to this civil action were persons as defined by W. Va. Code § 5-11-3(a).

23. This is a civil rights action by Timothy Jones and Janie Cole for unlawful retaliatory acts against them as the parents of Z.S.J. meant to punish, intimidate, threaten, coerce and discriminate against them in retribution for their advocacy on behalf of Z.S.J.

24. Timothy Jones and Janie Cole each seek damages and costs pursuant to the Americans With Disabilities Act of 1991 (42 U.S.C. §§ 12101 *et seq.*) (hereinafter referred to as "ADA"), Section 504 of the Rehabilitation Act of 1973, currently codified at 29 U.S.C §794, the Civil Rights Act of 1964 and the West Virginia Human Rights Act, W. Va. Code §§5-11-1, *et seq.*

25. This Court has original jurisdiction to hear and decide this case under 28 U.S.C. §§ 1331 and 1343.

26. Supplemental jurisdiction for this Court to hear and decide claims brought under parallel West Virginia law arising from the same nucleus of operative facts is predicated on 28 U.S.C. § 1367.

27. The claims of Timothy Jones and Janie Cole are authorized by 28 U.S.C. §§ 2201 and 2202.

28. All actions complained of herein took place within the jurisdiction of the United States District Court, Southern District of West Virginia, and venue is invoked pursuant to 28 U.S.C. § 1391(b), (c).

29. During the school year 2017/2018 and, upon information, during the school year 2018/2019 [the relevant time period], no student attending Winfield Elementary School was required to ride the school bus in order to attend school; there was no restriction upon any student being driven to Winfield Elementary School by a parent or other person.

30. During the relevant time period, Winfield Elementary School established a written policy permitting parents who did not wish to have their children ride the school bus to drive their children to school and park parallel to the school in a parking area on the private property of the Board of Education which ran parallel with and abutting a public street in the City of Winfield known as Wall Street; both the parking area lying adjacent to and abutting upon Wall Street and Wall Street itself are situated within a "residence district" as defined by W. Va. Code §17C-1-45.

31. During the relevant time period, the Winfield Elementary School written "streamlined" drop off policy required all personal vehicles bringing children to school to pull as near as possible to signs on display near the center doors of the school where "drop-off valet staff" would then direct 6 to 10 cars at a time to unload students; after unloading, these vehicles were to pull away and 6 to 10 other vehicles in the line would take their place, unload and leave, and so on and so on until all traffic was unloaded.

32. During the relevant time period, Timothy Jones and Janie Cole chose to drive Z.S.J to Winfield Elementary School so he could be treated just like the other non-disabled students, instead of putting Z.S.J., unaccompanied, on what the Board designated as the "special needs bus" restricted to transporting children such as Z.S.J. in an isolated environment.

33. During the relevant time period, the Board, acting through Hatfield as principal asked Timothy Jones and Janie Cole to abide by an unwritten modification of this "streamlined" drop off procedure that required them to sit in the line of drop off traffic until all the vehicles in their group of 6 to 10 vehicles had unloaded all non-disabled students, wait for all traffic in front of them to move on and then pull to a separate area farther from the doors of the school where Z.S.J. could be unloaded from the vehicle and taken to school.

34. The plaintiff specifically voiced objection to this unwritten policy that applied only to Z.S.J. and advised Hatfield and other agents of the Board that Z.S.J. often became agitated verbally and physically because of the delay caused by the volume of traffic in front of the school; Hatfield labeled Mr. Jones' expressions of concern regarding the undue delay for his disabled son as "belligerent, difficult and defiant."

35. On a number of occasions, Timothy Jones abided by the Winfield Elementary School written policy and allowed Z.S.J. to exit his vehicle in the line of traffic where other nondisabled students were getting out of their cars and going to school, often resulting in some unfortunate delay to other parents of nondisabled students because of the time Z.S.J. takes to get out of a car.

36. During the relevant time period, Timothy Jones and Janie Cole constantly advocated on behalf of Z.S.J. for either strict enforcement of the Winfield Elementary School unloading policy or a parking solution in the form of a designated drop-off area for Z.S.J. located on the same side of Wall Street as Winfield Elementary School, thereby meeting Z.S.J.'s individual needs as adequately as Winfield Elementary School was meeting the needs of nonhandicapped students.

37. While Tim Jones repeatedly asked that a uniform drop off policy be put in place for Z.S.J., the Board and Hatfield chose to blame Z.S.J.'s disability for the problems by citing the inability of Mr. Jones and Ms. Cole to make sure that Z.S.J. was always "ready" to exit his vehicle promptly, deliberately ignoring the fact that the inability of Z.S.J. to always be "ready" to exit his vehicle was a function of the behavioral issues related to his disability—acting out, undressing, refusing to eat and refusing to leave the vehicle.

38. Each of the defendants was aware and had first-hand personal knowledge of the protected activities engaged in by the plaintiffs as advocates for an accommodation in the manner in which the defendants administered the drop off policy at Winfield Elementary School.

39. Commencing on August 27, 2018 and continuing through January 6, 2019, the defendants engaged in unlawful discriminatory actions toward the plaintiffs in the form of threats, coercion and retaliatory malicious prosecution, all of which was motivated in whole or in part by the protected activities engaged in by the plaintiffs seeking an accommodation for their disabled son.

40. Upon information and belief, the constant advocacy of Timothy Jones and Janie Cole on behalf of Z. S. J. caused Hudson, Hatfield, Coey and Starcher to conclude that Timothy Jones had "issues" and that he was a "difficult" man and to label both Timothy Jones and Janie Cole as "non-stable parents" and "crazies."

41. During the relevant time period Coey was frequently present on the premises of Winfield Elementary School even though she was not legally qualified to serve as a Prevention Resource Officer in any Putnam County school, either because she had not completed the necessary training to be certified or because she was off on light duty and maternity leave from the Winfield Police Department and not a current full time, state certified police officer.

42. Despite her lack of qualification as a prevention resource officer, Coey was present on the premises of Winfield Elementary School for some reason during the spring months of 2018 during which time she claims to have had some interaction with the plaintiffs and become aware of the drop off policy that was to apply to "every student," presumably regardless of disability.

43. Upon information and belief, and according to statements made by Coey in the Magistrate Court of Putnam County, West Virginia, she and faculty members at Winfield Elementary School had spoken with Timothy Jones about the drop off policy in the school year 2017 – 2018 and given Mr. Jones "warnings on this matter."

44. Before the morning of Monday, August 27, 2018, Timothy Jones had never knowingly interacted with Coey and had never seen Coey in uniform as a police officer at Winfield Elementary School, or anywhere else.

45. On the morning of August 27, 2018, Timothy Jones drove Z.S.J. to a point on or adjacent to Wall Street in front of the center doors of Winfield Elementary School within the zone identified in the written "streamlined" drop off policy, exited the driver side of his vehicle, went to the rear of his vehicle, opened the rear passenger door and leaned into his vehicle to assist Z.S.J. out of the car so that he could go in the center doors of the school.

46. As Timothy Jones assisted Z.S.J. in exiting the vehicle, Coey, acting as an agent of the Board and on its behalf, dressed in blue jeans, a tee shirt and flip flop sandals and displaying no indicia of law enforcement authority, approached Mr. Jones from the rear without identifying herself and demanded that he put his son back in the car and drive on to the secondary unloading zone defined by the unwritten policy that the Board chose to enforce relative to Z.S.J.

47. In a loud, frustrated but nonviolent and nonthreatening tone of voice, Mr. Jones told Coey that he did not need a lecture and that all he needed was help getting his disabled son out of the car and a consistent drop off policy that would not cause his son undue delay in going to school.

48. At the conclusion of this brief, disagreeable but nonconfrontational conversation, Coey took Z.S.J. by the hand and led him into school while Timothy Jones peacefully got back in his car and left for his day's work assuming that Coey was an aid at Winfield Elementary who had been assigned safety duty that morning.

49. Following the confrontation of August 27, Timothy Jones became concerned regarding drop off policy for the upcoming school year and decided to take Z.S.J. to school on August 28 by parking near the school's office, having his son's teacher come to the office to take him back to his classroom area and then seeking someone with whom he could discuss the ongoing issues regarding student drop-off.

50. Mr. Jones complied fully with the visitor's policy of the Board by reporting immediately to the school office with his son for the purpose of dropping Z.S.J. off for school and finding someone he could talk to about the issues with Z.S.J.'s drop-off at school.

51. After Timothy Jones delivered Z.S.J. to his teacher, Coey, attired in blue jeans, a black tee shirt, a head band, pushed up reflective sun glasses and flip flop sandals, approached Mr. Jones in the office area of Winfield Elementary School, and demanded that Mr. Jones produce a driver's license, even though Mr. Jones' identity was clearly known to everyone in the room and to Coey.

52. When Mr. Jones questioned why Coey needed to see his driver's license, Coey for the first time displayed a badge to Mr. Jones and told him that on the direction of Starcher he was

going to receive a citation for the "incident" that had occurred on the previous morning of August 27, 2018.

53. Mr. Jones lawfully questioned why Coey needed to see his driver's license since she clearly knew who he was and had been instructed to confront him when he brought his son to school that morning.

54. Coey responded to Mr. Jones' lawful inquiry regarding why he was being questioned and asked to present a driver's license by telling Mr. Jones that he was being detained in the office area of the school and could not leave until other police personnel appeared.

55. Coey then positioned herself between Timothy Jones and the exit door and held Mr. Jones unlawfully and against his will for a period of approximately two minutes while Mr. Jones stood peacefully in the office and observed Coey talking on the telephone to some unknown individuals, now believed to be agents of the Board, after which Coey told Mr. Jones: "You can go now."

56. After having been unlawfully detained in the office of Winfield Elementary School, Mr. Jones made contact with Griffith and asked for a meeting so that he could discuss drop-off arrangements for his son and continue to advocate for his son's rights as a disabled person to be accommodated at the school drop-off area.

57. While Mr. Jones was at the Board office awaiting an opportunity to meet with Griffith, Janie Cole called him to see how things had gone that morning with the school drop-off.

58. After Mr. Jones told Ms. Cole what had happened in the school office that morning, Ms. Cole called the office of Winfield Elementary School to speak with someone about the day's occurrences and the continuing issues with school drop-off.

59. After Ms. Cole identified herself to the office attendant who answered the phone at Winfield Elementary School, she was placed on hold for a period of seven minutes awaiting someone to pick up her call.

60. At the end of her seven-minute wait, Ms. Cole's call was answered by Hatfield who stated that she was in a room at Winfield Elementary with her assistant principal, Coey and Starcher on a speakerphone.

61. Hatfield then turned the telephone call over to Coey who started the conversation by stating that Mr. Jones had refused to interrupt his unloading of Z.S.J. the previous day.

62. Ms. Cole then questioned Coey about whether Mr. Jones had been aware of her status as a purported officer and whether she had been in uniform during her interaction with Mr. Jones the previous day.

63. At this point Starcher, in the presence of Coey, Hatfield and another Board employee, interrupted the conversation to tell Ms. Cole that Coey was not in uniform because she was pregnant and on light duty.

64. When Ms. Cole attempted to explain to Hatfield, Starcher and Coey that her husband would have had no reason not to comply with the police officer had he been aware of her identity, Starcher confronted her in a threatening tone and attempted to frighten her by lying and telling her that someone was at that moment at the prosecuting attorney's office deciding whether or not to go arrest Mr. Jones.

65. Ms. Cole again explained that the only reason her husband would have stopped in front of the school was to let their disabled son out to go to class.

66. Ms. Cole asked to speak with Hatfield in another attempt to get the drop off situation resolved at which point Starcher interrupted and stated that "your husband is a grown man and he knew what he was doing; one of two things are going to happen, we are going to issue a citation or haul his ass to jail."

67. When Ms. Cole again asked to speak to Hatfield to arrange a meeting to resolve the drop-off procedure for the future, Coey interrupted to say that "they have received your request for an IEP meeting."

68. At this point Ms. Cole advised Hatfield, Starcher and Coey that her husband was at the Board office to try and meet with Griffith but that a further meeting would probably be necessary.

69. Ms. Cole then overheard Starcher advising someone, believed to be Hudson, that Mr. Jones was at the Board office and that he, Starcher, was headed there immediately.

70. Hatfield, Coey and Starcher then abruptly ended the telephone call with Ms. Cole, leaving her to fear for what consequences might await her husband.

71. At 9:10 a.m. August 28, 2018, Hudson confirmed with Starcher by text message the arrangements he and Griffith had made to assure that Mr. Jones was held in the waiting room of the Board's central office until Starcher, armed and in uniform, could be escorted into the meeting room without Mr. Jones' knowledge.

72. Timothy Jones was then escorted by Board personnel into a meeting room where he was confronted by Griffith and Starcher.

73. Confronted with armed authority, Mr. Jones felt threatened, intimidated and coerced as he was compelled to participate in a meeting discussing his son's transportation and

13

disability in the presence of Starcher who had, according to Starcher's text messaging to Hudson formed an express belief that Mr. Jones' advocacy for his son meant that he had "issues,".

74. During the course of the August 28, 2018, meeting Griffith repeatedly told Mr. Jones not to drive his son to school, told Mr. Jones over one dozen times that his son should ride the "special needs bus," and that the concerns of Mr. Jones and his wife about Z.S.J.'s ability to adjust to riding the special needs bus were unfounded even though Griffith knew that Z.S.J, due to his disability, often hit other students and faculty, intentionally threw objects about the room and had been proposed for suspension from school in March, 2018 because he had struck another student and inflicted an injury that required stitches.

75. Griffith dismissed Mr. Jones' concerns about Z.S.J.'s inability to communicate his feelings about the special needs bus and Starcher threatened Mr. Jones for raising the issue even though Griffith knew that as early as May 9, 2017, that Z.S.J., because of his disability, possessed reduced communication skills that made it difficult for him to ask and respond to questions during conversations and interaction with teachers, peers and family.

76. As Timothy Jones continued to advocate for an accommodation for his son to be driven to school by telling Starcher and Griffith that he "would do anything" to get the drop off issue resolved, Starcher intervened in a threatening, coercive and intimidating tone of voice to tell Mr. Jones that he was confronted with choices and that there was no need to cater to his concerns about his son, that warrants or criminal complaints were going to be obtained for Mr. Jones and that: "This is not needing [sic] to happen at this school or any school here in Putnam County, okay?"

77. Starcher, with the acquiescence and apparent authority of Hudson and Griffith, continued to threaten, coerce and intimidate Timothy Jones by telling him: "You need to take a

little advice from me. You need to take that help and run with it. Don't be the person who's always a troublemaker. … The only person that's got problem is you because you're being obstinate, okay? You've got to be nice. You got to be – yes, and do what their rules are."

78. Starcher, again with the acquiescence and apparent authority of Hudson and Griffith, proceeded to tell Mr. Jones in a threatening, coercive and intimidating voice: "If an officer comes up to you and says something, they expect you to do something, you're expected to do it. You don't argue with them. You don't get in their face. You're lucky – you're very lucky that she [Coey] is pregnant and she's off on light duty or she would've arrested you today."

79. At 12:26 PM on August 28, 2018 Griffith sent a text message to Starcher telling him "thank you for your help this morning!" To which Starcher replied "any time girl u know that. Glad I can help. That guys [sic] can't be pleased. We are getting warrants today. I wasn't too harsh was I on him?" Griffith replied, "No you were not too harsh at all. He's a difficult man. I'll touch base with you. I worked with him for over a year."

80. At 3:11 PM on August 28, 2018 Starcher sent a text to Griffith advising her that summonses had been issued for Mr. Jones which led Griffith to disclose to Starcher "okay I have two options for the parents. One is special transportation and the other is to park in parent parking behind the building in front of ballfield. I don't think he likes to park in parent parking from what I've been told." And Starcher replied "those are great options but he will not like anything you will do that's the type of person he is. We will support whatever you want so long as he is not breaking any laws."

81. Griffith and Starcher continued their midafternoon text exchange with Starcher asking Griffith to inform Hudson about the summons and telling her to have anyone with questions call him at any time before saying: "I hope you're having a great year so far." Griffith replied: " I

will let the superintendents know. My year is a little crazy, I seem to get the non-stable parents. Thank you." Starcher expressed his sense of understanding by saying "ha ha that's me with every stop. Ha, ha" leading Griffith to remark "I bet!! I seem to attract the crazies!! LOL I deal with upset people all day it's part of my job." Starcher responded by saying "I know right. Don't attract any more crazies for a while."

82. On August 28, 2018, Coey with the participation, agreement and approval of Hudson, Griffith, Hatfield and Starcher, presented herself at the Magistrate Court of Putnam County and obtained two criminal complaints against Timothy Jones by submitting materially false statements, accusing Mr. Jones of stopping, parking or leaving his vehicle upon a highway outside a business or residence district, forcibly or illegally hindering or obstructing a law enforcement officer in her official capacity and failure to have a driver's license in his possession at all times while operating a motor vehicle.

83. At the time Coey made these materially false statements to the Putnam County Magistrate Court, she had actual knowledge that the statements were false; that same knowledge was later conveyed to Starcher, Hudson and Hatfield.

84. At 7:58 AM on September 6, 2018, the current president of the Board was notified in writing of the unlawful retaliatory acts directed by Board personnel against the plaintiffs and asked in his capacity as a former member of the West Virginia Department of Public Safety to review the allegations contained in the criminal complaints obtained by the defendants against Mr. Jones.

85. On September 7, 2018 at 10:48 AM Hudson committed an overt act support of the defendants' conspiracy to retaliate against the plaintiffs and prolong the malicious criminal prosecution the defendants had caused to be initiated; at that date and time Hudson requested that

Griffith perform a "confidential audit" of Board records relative to the plaintiffs and Z.S.J. to "ensure that everything is in order and is in place" and to "ensure there are no gaps that the parent could claim regarding any missed timelines, services, etc."

86. In furtherance of their retaliatory motivation towards the plaintiffs, and contrary to the Board's written policy regarding notification of complaints of disability discrimination, the materially false criminal complaints obtained by the Board and its agents against Mr. Jones were not investigated and were wrongfully permitted to remain pending, subjecting Mr. Jones to the threat of imprisonment, for a period in excess of four months prior to the summary dismissal of the retaliatory complaints on Tim Jones' motion and without objection by the Putnam County Prosecuting Attorney.

87. On or about September 12, 2018, Timothy Jones was compelled to hire counsel to defend him in Putnam County Magistrate criminal cases 18-M-05161,2; Mr. Jones was caused to appear in the Magistrate Court of Putnam County for arraignment on September 12, 2018; Mr. Jones was caused to appear at a pretrial hearing on November 1, 2018; on January 4, 2019 all charges against Timothy Jones were dismissed on his motion without objection by the Putnam County Prosecuting Attorney.

88. All of the threats, coercive conduct, intimidating acts and initiation of malicious criminal prosecution directed towards Timothy Jones were in retaliation and reprisal against Timothy Jones and Janie Cole for their protected activities in advocating vigorously on behalf of their disabled son to secure for him rights guaranteed by federal and state law including the Americans With Disabilities Act of 1991 (42 U.S.C. §§ 12101 *et seq*.) (hereinafter referred to as "ADA") 42 U.S.C §12203, Section 504 of the Rehabilitation Act of 1973, currently codified at 29

U.S.C §794, 29 CFR § 33.13, the Civil Rights Act of 1964 and the West Virginia Human Rights Act, W. Va. Code §5-11-9(C).

89. All of the threats, coercive conduct, intimidating acts and initiation of malicious criminal prosecutions were committed by the defendants in bad faith and as acts of gross misjudgment that were motivated at least in part to retaliate against the plaintiffs for their protected advocacy on Z.S.J.'s behalf.

90. As a direct and proximate result of the acts of bad faith in gross misjudgment committed by each of the defendants, both Timothy Jones and Janie Cole have suffered embarrassment, humiliation, emotional upset, mental anguish and aggravation, annoyance and inconvenience.

91. As a further direct and proximate result of the acts of bad faith and gross misjudgment committed by each of the defendants, Timothy Jones and Janie Cole have sustained economic loss associated with the removal of their son from Putnam County schools, the establishment of a residence in Kanawha County, West Virginia where their son is currently enrolled, and for significant attorney fees and expenses associated with the defense of Timothy Jones to the malicious criminal prosecution that formed a part of the defendants' bad faith and gross misjudgment.

92. The conduct of each of the defendants, both individually and acting in conspiracy with each other, to retaliate, coerce, intimidate, threaten and maliciously prosecute Timothy Jones and persecute Janie Cole was done intentionally and in total disregard for the rights of Timothy Jones and Janie Cole secured by the anti-retaliatory provisions of the Americans With Disabilities Act of 1991 (42 U.S.C. §§ 12101 *et seq.*) (hereinafter referred to as "ADA") 42 U.S.C §12203, Section 504 of the Rehabilitation Act of 1973, currently codified at 29 U.S.C §794, 29 CFR §

33.13, the Civil Rights Act of 1964 and the West Virginia Human Rights Act, W. Va. Code §5-11-9(C) to the extent that an award of punitive damages should be rendered against them.

93. The conduct of the Board, Hudson and Hatfield in failing to make any reasonable inquiry regarding the malicious criminal prosecution initiated against Timothy Jones and to cause the same to be dismissed before Mr. Jones was subjected to four months of living under the fear and apprehension of being imprisoned, is a separate and distinct act of retaliatory, discriminatory conduct, bad faith and gross misjudgment on the part of these defendants that is so reprehensible and shocking to the conscience that an additional award of punitive and exemplary damages under the provisions of the West Virginia Human Rights act should be rendered against them both jointly and severally.

94. Plaintiffs' claims against the defendants for retaliatory conduct under the Americans with Disabilities Act of 1991 and Section 504 of the Rehabilitation Act of 1973 are only against them in their official capacities.

95. Plaintiffs' claims against the defendants for any form of reprisal against the plaintiffs because of their advocacy for an accommodation for their son due to disability under the West Virginia Human Rights Act, W. Va. Code §5-11-9(C) are against them in their official capacities in maintaining a place of public accommodation and individually as "persons" defined by the West Virginia Human Rights Act, W. Va. Code §5-11-3(a).

96. None of the defendants are entitled to any statutory immunity under the provisions of W. Va. Code §§29-12A-1, et seq., inasmuch as those provisions, by their terms, do not apply to, and shall not be construed to apply to, civil claims based on violations of the Constitution or statutes of the United States, nor can those provisions apply to liability under the West Virginia Human Rights Act that is expressly imposed by the provisions of W. Va. Code §§5-11-1, et seq.

WHEREFORE, Timothy R. Jones and Janie Cole respectfully request the following relief:

1. Compensatory damages in an amount that will reasonably compensate them for the injuries and damages they have sustained;

2. An award of exemplary or punitive damages, insofar as permitted by law, in an amount sufficient to punish and chastise the defendants for their acts of bad faith and gross misjudgment and for the acts of the Board, Hudson and Hatfield for intentionally allowing the malicious prosecution of Timothy R. Jones to continue;

3. Attorney's fees, litigation expenses, and costs of this action; and

4. Both pre-judgment and post-judgment interest for any award made herein.

PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL ISSUES SO TRIABLE HEREIN.

TIMOTHY R. JONES AND JANIE COLE
BY COUNSEL

/s/      Harvey D. Peyton
HARVEY D. PEYTON, ESQUIRE
West Virginia State Bar No. 2890
PEYTON LAW FIRM, PLLC
2801 First Avenue, P.O. Box 216
Nitro, WV 25143
Telephone:   (304) 755-5556
Telefax:     (304) 755-1255
*Counsel for the Plaintiffs*