# IN THE UNITED STATES DISTRICT COURT FOR
# THE SOUTHERN DISTRICT OF WEST VIRGINIA

## HUNTINGTON DIVISION

TIMOTHY R. JONES and
JANIE COLE,

                      Plaintiffs,

v.                                      CIVIL ACTION NO. 3:19-0618

THE BOARD OF EDUCATION OF
PUTNAM COUNTY, WEST VIRGINIA,
JOHN HUDSON, individually and in his official capacity as
Superintendent of Schools for Putnam County;
SHARLA GRIFFITH, individually and in her capacity as
Putnam County Director of Exceptional Education,
CANDI HATFIELD, individually and in her official capacity as
Principal of Winfield Elementary School;
ALICIA COEY, a/k/a Alicia Powell, individually
and in her official capacity as a Prevention Resource Officer, and
EDDIE STARCHER, individually and in his official capacity as
Chief of Police of Winfield, West Virginia,

                      Defendants.

## MEMORANDUM OPINION AND ORDER

Two motions to dismiss are currently pending before the Court, both filed by a different set of defendants. The first motion argues for dismissal of all claims asserted against the Putnam County Board of Education ("PCBOE"), Superintendent John Hudson, Director of Exceptional Education Sharla Griffith, and Principal Candi Hatfield (collectively "PCBOE Defendants"). *PCBOE Mot. to Dismiss*, ECF No. 21. The second motion argues for dismissal of all claims raised against Officer Alicia Coey and Chief Eddie Starcher. *Coey/Starcher Mot. to Dismiss*, ECF No. 23. For the reasons set forth herein, the Court **GRANTS IN PART** and **DENIES IN PART** the motions.

# I. BACKGROUND

This case begins like most school days: with a drop-off at the schoolhouse doors.[1] On August 27, 2018, Plaintiff Timothy Jones—father of Z.S.J., a minor student with Down syndrome—arrived with his son at Winfield Elementary School.[2] *Am. Compl.*, ECF No. 17, at ¶¶ 4, 45. Pursuant to a "streamlined" drop-off policy that had been adopted the previous school year, Jones pulled his car into the designated area, exited the driver's side, and moved to the rear of the vehicle to guide Z.S.J. out of the car "so that he could go in the center doors of the school." *Id.* at ¶ 45. While Jones assisted Z.S.J., Officer (and Defendant) Alicia Coey—pregnant, on "light duty," and dressed in jeans, a t-shirt, and sandals—approached the car and "demanded he put his son back in the car and drive on to the secondary unloading zone defined by [an] unwritten policy that the Board chose to enforce relative to Z.S.J." *Id.* at ¶ 46.

Principal (and Defendant) Candi Hatfield allegedly informed Jones and his wife, Plaintiff Janie Cole, of this "unwritten policy" at some point before August 27. *Id.* at ¶ 33. Specifically, Jones alleges that Hatfield asked them to wait in the drop-off line, pull forward to the front of the line, and then continue on to a "separate area farther from the doors of the school where Z.S.J. could be unloaded from the vehicle." *Id.* at ¶ 34. Rather than follow the unwritten policy, on "a number of occasions" Jones dropped Z.S.J. at the front of the school. *Id.* at ¶ 35. This "often result[ed] in some unfortunate delay to other parents of nondisabled students because of the time Z.S.J. takes to get out of a car." *Id.* Plaintiffs simultaneously began advocating for a "uniform" policy that would allow their son to exit the car at the main drop-off point. *Id.* at ¶ 37, 40. Jones'

---

[1] These facts are taken from the Amended Complaint, and are accepted as true at this stage of litigation. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

[2] Rather than placing him on the "special needs bus," Plaintiffs had decided to drive Z.S.J. to school "so he could be treated just like the other non-disabled students." *Id.* at ¶ 32.

objections to Z.S.J.'s specialized drop-off policy were consequently widely known by the time he arrived at Winfield Elementary on August 27. *See id.* at ¶¶ 36–38.

Unsurprisingly given this background, Jones' reaction to Coey's order was less than positive. Unaware he was speaking to a police officer, Jones responded in a "loud, frustrated but nonviolent tone of voice" that "he did not need a lecture." *Id.* at ¶¶ 46–47. The relatively brief encounter ended with Coey taking Z.S.J. by the hand to lead him into the school and Jones returning to his vehicle and driving away. *Id.* at ¶ 48. Nevertheless, the confrontation was sufficiently alarming to Jones that he decided "to take Z.S.J. to school on August 28 by parking near the school's office, having his son's teacher come to the office to take him back to his classroom area[,] and then seeking someone with whom he could discuss the ongoing issues regarding student drop-off." *Id.* at ¶ 49.

Unfortunately for Jones, the morning of August 28 would be no less confrontational than the previous day. After Jones left Z.S.J. with his teacher, Officer Coey appeared in the office, displayed her badge "for the first time," and ordered him to produce a driver's license. *Id.* at ¶ 52. Jones "questioned why Coey needed to see his driver's license since she clearly knew who he was." *Id.* at ¶ 53. Coey responded that "he was being detained in the office area of the school and could not leave until other police personnel appeared," and then positioned herself between Jones and the exit. *Id.* at ¶¶ 54–55. She also informed him that he would receive a citation for the prior morning's incident. *Id.* at ¶ 52. Minutes later, however, Coey reversed herself and informed Jones that he was free to leave. *Id.* at ¶ 55.

Despite Coey's offer, Jones elected to stay in hope of obtaining a meeting with Director of Exceptional Education (and Defendant) Sharla Griffith. *Id.* at ¶ 56. Cole called Jones to inquire about the morning's drop-off experience, and was understandably alarmed by the turn of events.

*Id.* at ¶¶ 57–58. She followed her call to Jones with a call to the school, where she was put on speakerphone with Principal Hatfield, the assistant principal, Officer Coey, and Chief of Police (and Defendant) Eddie Starcher. *Id.* at ¶ 60. This conversation quickly grew combative, with Starcher confronting Cole in a "threatening tone" and "telling her that someone was at that moment at the prosecuting attorney's office deciding whether or not to go arrest Mr. Jones." *Id.* at ¶ 64. After Cole asked to speak with Hatfield about the drop-off dispute, she alleges that Starcher interjected again and cautioned that "one of two things are going to happen, we are going to issue a citation or haul his ass to jail." *Id.* at ¶ 66. Soon after, Hatfield, Coey, and Starcher "abruptly ended the telephone call."[3] *Id.* at ¶ 69.

Following the call with Cole, administrators escorted Jones into a meeting room "where he was confronted by Griffith and Starcher." *Id.* at ¶ 72. Jones felt "threatened, intimidated and coerced" by the presence of Starcher, who was armed. *Id.* at ¶ 73. Griffith repeatedly informed Jones that he should refrain from driving his son to school and that Z.S.J. should ride the "special needs bus" instead. *Id.* at ¶ 74. Starcher contributed to the conversation as well, informing Jones "that he was confronted with choices and that there was no need to cater to his concerns about his son, that warrants or criminal complaints were going to be obtained," and that an accommodated drop-off plan would not "happen at this school or any school here in Putnam County."[4] *Id.* at ¶ 76. The meeting ended without a resolution.

---

[3] Although it is unclear exactly how he was involved with the call, the Amended Complaint alleges that Superintendent (and Defendant) Hudson was present for at least a portion of it. *Id.* at ¶ 69.

[4] Starcher further advised Jones not to "be the person who's always a troublemaker" and that he was "very lucky that [Coey] was pregnant and . . . off on light duty or she would've arrested you today." *Id.* at ¶¶ 77–78.

After the meeting, Griffith texted Starcher to thank him "for your help this morning!" *Id.* at ¶ 79. Starcher replied "any time girl u know that. Glad I can help. That guys [sic] can't be pleased. We are getting warrants today. I wasn't too harsh was I on him?" *Id.* Griffith dispelled his concerns, responding that Starcher was "not too harsh at all." *Id.* Later that afternoon, Griffith informed Starcher of several options for Z.S.J.'s drop-off, to which Starcher responded that "We will support whatever you want." *Id.* at ¶ 80. At various points in their exchange, Griffith and Starcher referred to Jones as "non-stable" and a "crazy." *Id.* at ¶ 81.

That afternoon, Coey traveled to the Magistrate Court of Putnam County and obtained two criminal complaints against Jones. In particular, the complaints accused Jones "of stopping, parking or leaving his vehicle upon a highway outside a business or residence district, forcibly or illegally hindering or obstructing a law enforcement officer in her official capacity[,] and failure to have a driver's license in his possession at all times while operating a motor vehicle." *Id.* at ¶ 82. Plaintiffs allege that Coey obtained the complaints by making materially false statements to the Magistrate Court, and that she had actual knowledge they were false at the time. *Id.* at ¶ 83. They also claim that the same knowledge was later conveyed to Starcher, Hudson, and Hatfield. *Id.* In response, Plaintiffs claim Hudson ordered a "confidential audit" of records relating to Plaintiffs and Z.S.J. to conceal any wrongdoing. *Id.* at ¶ 85. While Jones hired counsel and appeared in court on several occasions, the charges were dismissed on his motion without objection by the prosecutor on January 4, 2019. *Id.* at ¶ 85.

Approximately nine months after the charges against Jones were dismissed, Plaintiffs filed suit in this Court. *Id.* at 1. At some point before initiating their lawsuit, it appears that Plaintiffs removed Z.S.J. from Putnam County schools and established a new residence in Kanawha County, West Virginia. *Id.* at ¶ 91. Plaintiffs allege that the entire course of conduct recounted above was

"in retaliation and reprisal . . . for [Plaintiffs'] protected activities in advocating vigorously on behalf of their disabled son to secure for him the rights guaranteed by federal and state law." *Id.* at ¶ 88. Plaintiffs raise claims under the Americans With Disabilities Act of 1991 ("ADA"), 42 U.S.C. § 12203, Section 504 of the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 794, and the West Virginia Human Rights Act ("WVHRA"), W. Va. Code § 5-11-9(c).[5] The PCBOE Defendants filed their first Motion to Dismiss on September 20, 2019, which was mooted by Plaintiffs' decision to file an Amended Complaint on October 3, 2019. *See Order*, ECF No. 20. The PCBOE Defendants filed a second Motion to Dismiss addressing the Amended Complaint on October 17, 2019. *See PCBOE Mot. to Dismiss*, at 1. On October 25, 2019, Coey and Starcher followed with their own Motion to Dismiss. *See Coey/Starcher Mot. to Dismiss*, at 1. The issues have since been fully briefed and are ripe for resolution.

## II. STANDARD OF REVIEW

Under Rule 8(a) of the Federal Rules of Civil Procedure, a complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief." In turn, Rule 12(b)(6) provides an avenue for a party to challenge a complaint for failure to meet this threshold, and authorizes courts to dismiss complaints that fail "to state a claim upon which relief can be granted." To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556

---

[5] The Amended Complaint also references the Civil Rights Act of 1964 in passing, *see Am. Compl.*, at ¶¶ 24, 88, 92, but points to no particular provision of the Act that would apply directly to this case. These references appear related to the fact that Section "504 was patterned after § 601 of the Civil Rights Act of 1964, which prohibits discrimination on the basis of race in federally funded programs." *Bowen v. Am. Hosp. Ass'n*, 476 U.S. 610, 624 (1986). As such, the Court reads the Amended Complaint as raising claims under three statutory umbrellas—the ADA, Section 504, and the WVHRA—with Section 601 of the Civil Rights Act of 1964 acting as a statutory precursor to Section 504.

U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Though plausibility is not always a bright line, it is well established that a "claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Mere "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* Similarly, courts are not required to consider "unwarranted inferences, unreasonable conclusion, or arguments." *Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 615 n. 26 (4th Cir. 2009).

Nevertheless, the purpose of a motion to dismiss is to test the formal sufficiency of a claim for relief—not to resolve the facts or merits of a case. 5A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1356 (3d ed. 1990). It follows that a court may only grant a motion to dismiss if, "after accepting all wellpleaded allegations in the plaintiff's complaint as true and drawing all reasonable factual inferences from those facts in the plaintiff's favor, it appears *certain* that the plaintiff cannot prove any set of facts in support of his claim entitling him to relief." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (emphasis added). With this standard in mind, the Court turns to a discussion of Defendants' motions.

### III. DISCUSSION

Defendants confront essentially two categories of claims: federal claims under the ADA and Section 504, and state claims under the WVHRA. Defendants essentially contend that Plaintiffs have failed to state a claim upon which relief may be granted with respect to either category, and alternatively advance several immunity arguments. The Court undertakes an analysis of both sets of claims below.

## A. Federal Claims

Both the ADA and Section 504 prohibit disability-based discrimination against qualified individuals. *See* 42 U.S.C. § 12132 (ADA) ("[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."); 29 U.S.C. § 794(a) (Section 504) ("No otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."). As Plaintiffs' claims against the individual defendants and the PCBOE implicate distinct legal issues, the Court will consider both categories of defendants separately.

### 1. Individual Defendants

At the outset, the Court notes that Plaintiffs raise their federal claims against the individual defendants solely in their official capacities. *Am. Compl.*, at ¶ 94. This much is appropriate, as personal-capacity damages are not available under the ADA or Section 504 against individuals who are not employers. *See Baird v. Rose*, 192 F.3d 462, 471–72 (1999) (reasoning that "[b]ecause Title VII does not authorize a remedy against individuals for violation of its provisions, and because Congress has made the remedies available in Title VII applicable to ADA actions, the ADA does not permit an action against individual defendants for retaliation for conduct protected by the ADA"); *Doe v. Univ. of Md. Med. Sys. Corp.*, 50 F.3d 1261, 1264 n. 9 (4th Cir. 1991) (applying same analysis to the ADA and Section 504 "[b]ecause the language of the two statutes is substantially the same"). Addressing these official-capacity claims, the individual defendants focus keenly on alleged factual shortcomings in the Amended Complaint. This attention is natural enough, as both the PCBOE defendants and Coey and Starcher move for dismissal pursuant to

Rule 12(b)(6). Yet their arguments sidestep Plaintiffs' much more clear-cut jurisdictional shortcoming: that "[a]n official-capacity suit is a suit for injunctive relief," *Bess v. Kanawha Cnty. Bd. of Educ.*, No. 2:08-cv-01020, 2009 WL 3062974, at *9 (S.D.W. Va. Sept. 17, 2009), which Plaintiffs unambiguously do not seek. *Am. Compl.*, at 20. As such, dismissal of Plaintiffs' federal claims is warranted with respect to the individual defendants.

**2. Putnam County Board of Education**

Unlike when raised against individuals, the ADA permits damage awards against public entities and Section 504 permits damage awards against recipients of federal funds. *Barnes v. Gorman*, 536 U.S. 181, 186–87 (2002). It thus falls to the Court to determine whether Plaintiffs have stated plausible claims for relief under the ADA and Section 504 with respect to the PCBOE. To state a claim for retaliation under the ADA, a plaintiff must establish "(1) that she has engaged in conduct protected by the ADA; (2) that she suffered an adverse action subsequent to engaging in the protected conduct; and (3) that there was a causal link between the protected activity and the adverse action." *Freilich v. Upper Chesapeake Health, Inc.*, 313 F.3d 205, 216 (4th Cir. 2002). Importantly, a plaintiff is *not* "required to show that she is a 'qualified individual with a disability to establish a prima facie case for retaliation." *Moore v. Loney*, No. GLR-11-2638, 2014 WL 671446, at *10 (D. Md. Feb. 19, 2014). Indeed, "[b]y its own terms, the ADA's retaliation provision seeks to protect all individuals who assist in the Act's enforcement, and who may thereby draw the ire" of those who violate its mandates. *Settle v. S.W. Rodgers, Co., Inc.*, 998 F. Supp. 657, 662 n. 8 (E.D. Va. 1998). Inasmuch as the ADA and Section 504 are "generally are construed to impose the same requirements," *Baird*, 192 F.3d at 468, the same elements apply to a claim for retaliation under Section 504. *See Hooven-Lewis v. Caldera*, 249 F.3d 259, 271-72 (4th Cir. 2001).

With this framework in mind, Plaintiffs has succeeded in stating a claim for relief that is plausible on its face. Plaintiffs allege that Z.S.J. was subject to an unwritten policy requiring that he be dropped off away from other nondisabled children. In turn, they claim the protected activity that is "shielded from retaliatory conduct is the advocacy for a lawful accommodation in opposition to acts or practices that may be unlawful." *Resp. in Opp'n to PCBOE Mot. to Dismiss*, ECF No. 25, at 9. Inasmuch as the goal of the ADA anti-retaliation provision is to "protect all individuals who assist in the act's enforcement," *Settle*, 998 F. Supp. at 662 n. 8, Plaintiffs' advocacy on behalf of their son constitutes a "protected activity."

Whether Plaintiffs suffered an adverse action is likewise a straightforward inquiry. Plaintiffs discuss Jones' "threatening and hostile" meeting with Director Griffith and Chief Starcher at the school board office. *Am. Compl.*, at ¶¶ 76–78. They recount Cole's alarming phone call with several administrators and Starcher, during which she was allegedly threatened with her husband's imprisonment. *Id.* at ¶ 66. They point to Coey's decision to obtain criminal complaints against Jones based on "materially false statements," and the PCBOE's subsequent inaction. *Id.* at ¶¶ 82, 86. Taken together, these allegations plausibly represent an "adverse action" within the meaning of the ADA and Section 504.

The final element of an anti-retaliation claim depends on a causal connection between Plaintiffs' advocacy and the adverse actions they have alleged. They cite text messages between Starcher and Griffith that demonstrate a degree of approval for Starcher's allegedly threatening approach to Jones, specifically predicated on the fact that Jones was a "difficult man." *Id.* at ¶ 79. They also point to the close temporal relationship between Jones' advocacy for his son and the initiation of criminal proceedings against him, and argue that this gives rise to an inference that a

causal connection existed between both events.[6] *Resp. in Opp'n to PCBOE Mot. to Dismiss*, at 14. While these allegations alone do not *establish* a causal connection, they do plausibly allege one.

As a final matter, the Court acknowledges the PCBOE Defendants' argument that the board is not liable for the conduct of either Coey or Starcher. They point to *Lacasse v. Didlake, Inc.*, 712 F. App'x 231 (4th Cir. 2018), for the proposition that vicarious liability will not lie against an employer where no employment or agency relationship has been formed. *PCBOE Mem. of Law*, ECF No. 22, at 11. As a statement of law, this is true enough. Yet the facts alleged in the Amended Complaint are suggestive of just such an agency relationship between Coey and Starcher and the school board. From the memorandum governing Coey's conduct at the school to the content of text messages exchanged by Griffith and Starcher, it appears that much of this case stems from the officers' attempts to enforce school policies. *See Am. Compl.*, at ¶¶ 13, 80. While further factual development will doubtless provide a fuller picture of the actual relationship between the officers and the board, Plaintiffs' factual allegations are taken as true at this stage of litigation. As such, this Court has little trouble concluding that Plaintiffs have succeeded in stating a claim for relief against the school board under the ADA and Section 504.

**B. State Claims**

Plaintiffs' next category of claims falls under the anti-retaliation provision of the WVHRA, though they are based on the same course of conduct raised with respect to their federal claims. As above, the Court will undertake separate analyses of Plaintiffs' claims as alleged against the individual defendants and the PCBOE.

---

[6] Defendants place great weight upon the fact that Officer Coey and Chief Starcher are not PCBOE employees. Formally speaking, this much is true. Yet Plaintiffs present specific factual allegations suggesting that the PCBOE exercised a great deal of control over their actions, ranging from Starcher's participation in administrative meetings to the existence of a memorandum governing Coey's actions at the elementary school. *Am. Compl.*, at ¶¶ 13, 79.

### 1. Individual Defendants

Under the WVHRA, it is unlawful for "any person being the owner, lessee, proprietor, manager, superintendent, agent or employee of any place of public accommodations to . . . [r]efuse, withhold from or deny to any individual because of his or her . . . disability, either directly or indirectly, any of the accommodations, advantages, facilities, privileges, or services of the place of public accommodations." W. Va. Code § 5-11-9(6)(A). Relevant to this case, the WVHRA also prohibits "any person, employer, employment agency, labor organization, owner, real estate broker, real estate salesman or financial institution" from "[e]ngag[ing] in any form of reprisal or otherwise discriminate against any person because he or she has opposed any practices or acts forbidden under this article." *Id.* at § 5-11-9(7)(C). To state a claim for retaliation under the WVHRA, plaintiffs must allege (1) that they were engaged in a protected activity, (2) that the defendants were aware of the protected activity, (3) that the defendants subsequently took adverse action against them, and (4) that the adverse action followed their protected activity within such a period of time that retaliatory motivation can be inferred. *See Frank's Shoe Store v. W. Va. Hum. Rts. Comm'n*, 365 S.E.2d 251, 259 (W. Va. 1986) (retaliatory discharge claim).

The first of these elements—the requirement that Plaintiffs engage in a "protected activity"—is most immediately relevant for the purposes of disposing of the instant motions. The Supreme Court of Appeals of West Virginia has broadly construed the types of "protected activity" covered by the WVHRA, interpreting its anti-retaliation provision as prohibiting "an employer or other person from retaliating against any individual for expressing opposition to a practice that he or she reasonably and in good faith believes violates the provisions of the Human Rights Act." *Hanlon v. Chambers*, 464 S.E.2d 741, 754 (W. Va. 1995). This standard has objective and subjective components. An individual's "opposition must be reasonable in the sense that it must

be based on a set of facts and a legal theory that are plausible," but it must also "be honestly held and more than a cover for troublemaking. *Id.* The subjective component of this test is readily satisfied here, as there is little doubt that Plaintiffs' opposition to the drop-off policy was honestly held. The objective component is satisfied as well, as Plaintiffs have alleged that the school's drop-off policy denied Z.S.J. equal "accommodations, advantages, facilities, privileges, or services of [a] place of public accommodations" because of his disability. *See* W. Va. Code § 5-11-9(6)(A).

Having established that Plaintiffs engaged in a protected activity in advocating for their son, the next three elements of a WVHRA anti-retaliation claim follow naturally. It appears clear that the defendants were aware of Plaintiffs' opposition to the school's unwritten drop-off policy. It is also evident that the defendants subsequently took adverse action against Plaintiffs, whether through the several threats identified throughout the Amended Complaint or through Jones' allegedly malicious prosecution.[7] The close temporal correlation between the events of August 27 (the day of Z.S.J.'s confrontational drop-off) and August 28 (the day of Plaintiffs' unpleasant encounters with Defendants) is likewise readily apparent.

Defendants counter by focusing on Plaintiffs' actions beyond strictly advocating for their son—entering a school without identification, for example. Coey and Starcher in particular contend that "[i]t cannot be stressed enough that Plaintiffs['] own facts fail to demonstrate that Plaintiff Jones [was] arrested for a discriminatory purpose," and that "Plaintiff Jones has no one to blame but himself for his dangerous and misguided actions." *Coey/Starcher Mem. of Law*, ECF No. 24, at 9. Overheated rhetoric aside, the defendants raise an important point. As this action moves forward, further factual development will likely clarify the circumstances surrounding these

---

[7] While Coey is the defendant responsible for obtaining the criminal complaints against Jones, Plaintiffs allege that she did so "with the participation, agreement, and approval of Hudson, Griffith, Hatfield, and Starcher." *Am. Compl.*, at 82.

events and Defendants will be free to rebut Plaintiffs allegations of retaliation with their own evidence. *See Skaggs v. Elk Run Coal Co., Inc.* 479 S.E.2d 561, 581–82 (W. Va. 1996). Yet it bears repeating that, for the purposes of a motion to dismiss, Plaintiffs have alleged sufficient facts to state a claim for relief.

As a final matter, the Court disagrees with the individual defendants' arguments that they are statutorily immune from liability. Under West Virginia law, "[a]n employee of a political subdivision is immune from liability unless . . . [h]is or her acts or omissions were manifestly outside the scope of employment or official responsibilities . . . [or h]is or her acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner." W. Va. Code § 29-12A-5(b). The individual defendants point to this language and argue that "Plaintiffs have failed to allege any facts to support allegations of malicious or reckless behavior or behavior done in bad faith." *PCBOE Reply Mem.*, ECF No. 26, at 10. To the contrary, the bulk of Plaintiffs' claims stem from allegedly malicious or reckless conduct. They characterize Jones' prosecution as explicitly "malicious," and allege that Defendants acted in bad faith for their roles in threatening both Plaintiffs with Jones' arrest. *See*, *e.g.*, *Am. Compl.*, at ¶¶ 93. Whether Plaintiffs will be able to prove malice or bad faith is admittedly a different question—one inappropriate for resolution at the motion to dismiss stage.

2. **Putnam County Board of Education**

Resolution of Plaintiffs' WVHRA claims against the PCBOE is straightforward. Under the West Virginia Governmental Tort Claims Act, "a political subdivision is liable in damages in a civil action" where "injury, death, or loss to persons or property [is] caused by the *negligent* performance of acts by their employees while acting within the scope of employment." W. Va. Code § 29-12A-4(c)(2) (emphasis added). Simply put, West Virginia political subdivisions are not

liable for the intentional malfeasance of their employees.[8] *See, e.g.*, *Gilco v. Logan Cnty. Comm'n*, No. 2:11-0032, 2012 WL 3580056, at *7–8 (S.D.W. Va. Aug. 17, 2012) (citing *Mallamo v. Town of Rivesville*, 477 S.E.2d 525, 533 (W. Va. 1996)). Plaintiffs cite to no authority suggesting that an exception applies here, and instead simply cite to the statutory definition of "place of public accommodations." *See* W. Va. Code § 5-11-3(j). While this is true, it does not alter the fact that West Virginia statutory immunity shields political subdivisions from liability stemming from the intentional acts of its employees.

Here, Plaintiffs have simply not pleaded facts that would support a finding of negligence by the PCBOE. They appear to admit as much, arguing forcefully—though incorrectly—that Defendants' allegedly *intentional* conduct is not subject to statutory immunity. *See Resp. in Opp'n to PCBOE Mot. to Dismiss*, at 17–18. Even conduct that would otherwise appear negligent—the PCBOE's failure to "make any reasonable inquiry regarding the malicious criminal prosecution initiated against" Jones, for example—is explicitly couched in intentional terms. *Am. Compl.*, at ¶ 93 (characterizing the PCBOE's actions as "a separate and distinct act of retaliatory, discriminatory conduct, bad faith and gross misjudgment"). Absent any allegations of negligence, liability will not lie against the PCBOE.

---

[8] The Court recognizes that an immunity regime subjecting political subdivisions to liability for negligent—but not intentional—conduct may appear perplexing at first glance, yet the negligence provision contained in section 29-12A-4(c)(2) works in concert with section 29-12A-5(b), which imposes liability upon *employees* of political subdivisions where their conduct is in bad faith, malicious, or wanton and reckless. *See Kelley v. City of Williamson, W. Va.*, 655 S.E.2d 528, 535 (W. Va. 2007) ("Before any final resolution can be reached in this case, a jury must determine whether [Defendant] acted in a negligent manner, thus subjecting the City to liability for his actions under West Virginia Code § 29-12A-4(c)(2), or if his acts were in bad faith, malicious, or wanton and reckless, thus subjecting [Defendant] to liability under West Virginia Code § 29-12A-5(b).").

## IV. CONCLUSION

For the reasons explained above, the Court **GRANTS IN PART** the PCBOE Defendants' Motion to Dismiss, ECF No. 21, with respect to Plaintiffs' state law claims against the Board and federal claims against Defendants Hudson, Griffith, and Hatfield, but **DENIES IN PART** the motion with respect to Plaintiffs' state law claims against Defendants Hudson, Griffith, and Hatfield and federal claims against the Board. The Court further **GRANTS IN PART** Defendants Coey and Starcher's Motion to Dismiss, ECF No. 23, with respect to Plaintiffs' federal claims, but **DENIES IN PART** their motion with respect to Plaintiffs' state law claims.

The Court **DIRECTS** the Clerk to send a copy of this Opinion and Order to counsel of record and any unrepresented parties.

ENTER: January 9, 2020

ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE